Exhibit"B"

THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

\* \* \* \* \*

| | |
|---|---|
| STATE OF TEXAS | \* |
| | \* |
| vs. | \*   NO. 9:20-CV-172-MJT |
| | \*   Beaumont, Texas |
| LEARJET 31A BEARING SERIAL | \*   10:10 a.m. - 12:14 p.m. |
| NUMBER 080 AND ASSIGNED AND | \*   November 16, 2020 |
| DISPLAYING REGISTRATION/TAIL | \* |
| NUMBER N260RC | \* |

\* \* \* \* \*

| | |
|---|---|
| STATE OF TEXAS | \* |
| | \* |
| vs. | \*   NO. 9:20-CV-175-MJT |
| | \*   Beaumont, Texas |
| CESSNA 560 CITATION JET | \* |
| BEARING SERIAL NUMBER | \*   10:10 a.m. - 12:14 p.m. |
| 560-0068 AND ASSIGNED AND | \*   November 16, 2020 |
| DISPLAYING REGISTRATION/TAIL | \* |
| NUMBER N569LM | \* |

\* \* \* \* \*

**MOTION HEARING**

BEFORE THE HONORABLE MICHAEL J. TRUNCALE
UNITED STATES DISTRICT JUDGE

\* \* \* \* \*

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 \* 409-330-1605

1 | **APPEARANCES:**

2 | For the Plaintiff:

3 |     MR. TOMMY L. COLEMAN
   |     **Assistant Criminal District Attorney**
4 |     101 West Mill Street
   |     Suite 247
5 |     Livingston, Texas 77351

6 | For Defendant Learjet 31A:

7 |     MR. MATHIS B. "MATT" BISHOP
   |     **Martin & Drought, P.C.**
8 |     300 Convent Street
   |     25th Floor
9 |     San Antonio, TX 78205

10 | For Defendant Cessna 560 Citation Jet:

11 |     MR. GARY L. EVANS
    |     Attorney at Law
12 |     **Coats & Evans, P.C.**
    |     P.O. Box 130246
13 |     The Woodlands, TX 77393

14 | Also Present:

15 |     MR. MILTON PURVIS

16 | Law Clerk:

17 |     Clara Brown

18 | Court Clerk:

19 |     JULIA COLYER

20 | Court Reporter:

21 |     EDWARD L. REED

22 |

23 |

24 |

25 |

1              **P R O C E E D I N G S**

2          **10:10 A.M. - NOVEMBER 16, 2020**

3              THE COURT:  The Court will now call for

4    hearing the case of the State of Texas vs. Cessna 560

5    Citation Jet Bearing Serial Number 500-0068 and

6    Assigned and Displaying Registration/Tail Number

7    N569LM, Case Number 9:20-CV-175; and State of Texas vs.

8    Learjet 31A Bearing Serial Number 080 and Assigned and

9    Displaying Registration/Tail Number N260RC, Case Number

10   9:20-CV-172.

11              My intent today is to consolidate these

12   hearings, since there are some joint issues pertaining

13   to both cases.  However, to the extent we may need to

14   deal with an issue that's specific to one case, I think

15   we can parse that out and make the record clear.

16              Does anyone have any objection to our

17   proceeding jointly?

18          MR. COLEMAN:  No objection from the State,

19   Your Honor.

20          MR. EVANS:  No objection, Your Honor.

21          MR. BISHOP:  No objection.

22          THE COURT:  Okay, are the parties ready?

23          MR. COLEMAN:  Tommy Coleman for the State of

24   Texas, present and ready to proceed, Your Honor.

25          MR. EVANS:  Gary Evans of Coats & Evans PC,

1  representing the Cessna Citation, Your Honor, ready to

2  proceed.

3          THE COURT:  Thank you very much.

4          MR. BISHOP:  Matt Bishop here for the

5  defendant in the Learjet 31A case, and I'm ready.

6          THE COURT:  Thank you.

7              I would also say, please be sure to speak

8  directly into the microphone.  I was told that for 34

9  years when I tried cases in this courtroom and I never

10  really appreciated that until I took the bench and

11  found out how bad the acoustics really are in this

12  courtroom.  And not just for my sake, but for the court

13  reporter, and obviously that's important because if the

14  court reporter doesn't hear it, it wasn't said.

15              Another thing I did notice.  We tried a

16  criminal jury trial recently in this courtroom and I

17  made that comment reminding the attorneys to be sure and

18  speak into the microphone, and as I said that, several

19  of the jurors nodded their heads up and down like,

20  "Thank you."  So it's amazing.  You think that your

21  voice carries, but it doesn't.  So I see we've got the

22  lectern up.  It might be a good time to talk into that.

23              All right.  As I understand it, with the

24  Cessna -- and I'm going to say "Cessna case" and

25  "Learjet case."  And we all know, because I've

1    described which case it was when we opened, that's what

2    we're talking about.  I may talk about the Cessna case

3    and Learjet case.  Is that okay?

4          MR. COLEMAN:  Yes, Your Honor, that's fine by

5    the State.

6          THE COURT:  Okay.  And as I understand it, in

7    the Cessna case we're here today on defendant's Motion

8    to Dismiss, which is document number 3.  Also, on the

9    plaintiff's, the State's Motion to Remand; correct?

10          MR. COLEMAN:  Your Honor, in light of the

11    Court's ruling in the Learjet case, I would like to

12    withdraw my Motion to Remand in the Cessna case.

13          THE COURT:  All right, thank you, Mr. Coleman.

14    I appreciate that.  In fact, I was going to ask you if

15    that would be fine.  Actually, since I ruled on that in

16    the Learjet case, I'm even more convinced that I made

17    the right call on that because of the federal issues

18    that predominate as to whether or not these jets are

19    properly registered under Federal Aviation regulations.

20    And it is pretty clear to me that since that's really,

21    I think, one of the things we're talking about, those

22    federal issues would predominate.

23          Now, on the Learjet case, we're also here

24    on the Motion to Dismiss.  And there's also in the

25    Learjet a Motion to Access the aircraft and perform

1   necessary maintenance.  That's document number 13.

2   And I think that incorporates a Motion for Protective

3   Order.  Am I correct on that, Mr. Bishop?

4           MR. BISHOP:  That's correct, Your Honor.  I

5   think we actually filed them as two separate motions

6   because that's how the clerk wanted them filed.  One is

7   a Motion to Access and one is a Motion for Protective

8   Order.  But it's essentially the same subject matter.

9   And that is set for today.  However, I would suggest

10  that we don't need to reach that if the Motion to

11  Dismiss is granted and the planes are released to the

12  owners.

13          THE COURT:  Well, I was going to ask you that,

14  so you answered my question before I could ask you the

15  question.  So thank you very much.

16              And just so I understand, Mr. Evans, in

17  the Cessna case we don't have before us, I don't think,

18  a motion for either protective order or a motion for

19  access to the aircraft nor to perform maintenance?

20          MR. EVANS:  That's affirmative, Your Honor.

21  We do have -- we received some documents from the State

22  indicating the periodic required maintenance that's

23  being performed to the citation.  However, it did

24  commence in August.  That comes under the heading of

25  "locking the barn after the horse is stolen" because

1  the aircraft sat for six to seven months with no

2  attention whatsoever and, in the process, has incurred

3  about $270,000 worth of damages as a result.

4              But the State did start maintaining it in

5  August of 2020 and I believe we have records indicating

6  now for August, September, and October of 2020 provided

7  by Mr. Coleman.

8              THE COURT:  Yes, okay, good.

9              MR. COLEMAN:  Your Honor, I'm sorry, if I may

10  respond?

11              THE COURT:  Please, of course.

12              MR. COLEMAN:  I am prepared and I brought a

13  witness here today who's willing to testify as to the

14  maintenance of the two aircraft at issue here today and

15  whether or not they are being properly maintained if

16  the Court is so inclined to hear from that witness.

17              THE COURT:  All right, who are the witnesses

18  who are here?

19              MR. COLEMAN:  The witness that I will be

20  calling to testify is Milton Purvis, and he is an

21  aircraft mechanic who's been charged with maintaining

22  the two aircraft at issue, the Learjet and the Cessna,

23  Your Honor.

24              THE COURT:  Vurvis, V-u-r-v-i-s?

25              MR. COLEMAN:  Purvis with a P, Your Honor.

```
 1            THE COURT:  With a P?

 2            MR. COLEMAN:  Yes, sir.

 3            THE COURT:  Purvis.  And is he here with

 4   Ms. Beatrice Purvis?

 5            MR. COLEMAN:  Yes, Your Honor, but I have no

 6   intention of calling her as a witness.

 7            THE COURT:  I take it, Ms. Purvis, you are

 8   here with Mr. Purvis to enjoy this beautiful day and to

 9   keep him company?

10            MS. PURVIS:  Yes.

11            THE COURT:  Okay.  Did y'all come up from The

12   Valley?

13            MR. PURVIS:  Yes, sir.

14            THE COURT:  All right.  So his total --

15   Mr. Purvis' testimony would be on the issue of

16   maintenance of the plane; correct?

17            MR. COLEMAN:  Yes, Your Honor.

18            THE COURT:  He's not here to testify about any

19   of the other motions; is that correct?

20            MR. COLEMAN:  No, Your Honor, that's correct.

21            THE COURT:  Do you have any other witnesses

22   you intend to call today?

23            MR. COLEMAN:  No, Judge.

24            THE COURT:  Okay.  How about for the

25   defendants?  Do y'all plan on calling any witnesses?
```

1          MR. BISHOP:  No, Your Honor, we don't.

2          MR. EVANS:  No, Your Honor

3          THE COURT:  I did anticipate that because I

4   think, really, most of what we're here to talk about

5   today are really issues that are under the pleadings.

6          Now, okay, let me ask this question,

7   Mr. Coleman.  With regard to the motion with a notice

8   of seizure and forfeiture that's been filed in both

9   cases, is the notice essentially the same, other than

10  the name of the jet and the name of the purported

11  owners, a Mr. Camarillo Montemayor and Mr. Gonzalez

12  Barragan?

13         MR. COLEMAN:  I think that's fair to say, Your

14  Honor.  They essentially mirror each other.

15         THE COURT:  Okay.  All right, I do have some

16  questions that I want to ask and talk about kind of

17  before I let you all argue.  I used to not always like

18  that because, when I prepared an argument, I was ready

19  to go.  And yet now I see that sometimes there may be

20  things where the judge is really focusing on and maybe

21  you ought to listen to the judge's questions and answer

22  those questions first.  But it may modify some of your

23  presentation or either shorten or amplify portions of

24  it based upon what I see here and at least have some

25  concern about.

1          First, I'm focusing on document 2 in the

2    Learjet case, which is the Notice of Seizure.  But it

3    could also be essentially the same as document 2 in the

4    Cessna case because it's the Notice of Seizure and

5    Intended Forfeiture.  So that's what I'm focusing on

6    right now and I just want to kind of go through this.

7          In the Notice of Forfeiture and Seizure

8    there is the allegation, at least, that the planes were

9    used for a variety -- allegedly used for a variety of

10   criminal activity.  And in that notice they incorporate

11   the affidavit of a constable by the name of Mr. Beau

12   Price.  And in paragraph 3 of the affidavit Mr. Price

13   talks about, based upon investigation, there is

14   possible -- possible illicit activity involving the

15   aircraft.  And I just wanted to ask you, Mr. Coleman,

16   about that use of the word "possible."

17          MR. COLEMAN:  Yes, Your Honor, I'm happy to

18   respond.  While that language in that particular

19   paragraph admittedly equivocates, if you would refer

20   to the -- I'm looking at the Learjet notice and the

21   affidavit attached to that.  Paragraph 23 is more

22   definite.  In fact, the language there states that,

23   "Based on the totality of the circumstances, as

24   indicated above, in my training and experience, I

25   formed the opinion that the individuals involved in the

1   scheme violated numerous state and federal laws."

2               So, while he may equivocate earlier on in

3   the affidavit, he makes it clear at the end of the

4   affidavit that he has formed an opinion that there were

5   certain law violations.

6           THE COURT:  Yeah, okay.  Well, and when we

7   talk about that, it's based upon -- I mean, as you

8   know, Mr. Coleman, I have, I'm sure you are aware,

9   entered forfeiture orders for all types of

10  devices (guns, automobiles, whatever) that were proven

11  to be  used in the commission of crimes, including drug

12  crimes.  So, I mean, the concept of issuing -- I'm not

13  opposed to issuing an order on forfeiture if it is

14  something that is based upon, you know, an actual

15  crime.

16              And in fact, as I look at the -- and this

17  really has not been briefed, and so I'll certainly

18  welcome additional briefing on it.  But there are some

19  cases, state cases that say, in order to use this

20  state statute -- and I'm obligated to follow the state

21  forfeiture statutes; correct?

22          MR. COLEMAN:  Yes, Your Honor.

23          THE COURT:  Is there any disagreement about

24  that?

25          MR. EVANS:  Not from the Cessna Citation, no,

1  Your Honor.

2          MR. BISHOP:  No, Your Honor.

3          THE COURT:  Okay.  There are a number of cases

4  from different Courts of Appeals, *State vs. $99,235.00*

5  *in United States Currency.*  That's 511 S.W.3d, 136.

6  There is also the case of *$227,877 Currency Money of*

7  *the United States vs. State,* 331 S.W.3d, 110.  Also,

8  there is *$130,510 in U.S. Lawful Currency vs. State,*

9  26 S.W.3d, 169.  And there are other cases.  But they

10 all talk about you can only do -- see, there's probable

11 cause in the context of forfeiture proceeding to form a

12 reasonable belief that there is a substantial

13 connection between the property to be forfeited and the

14 criminal activity defined.

15          You can see there is some concern, then,

16 when I see an affidavit presented to me that talks

17 about "possible" illicit, as opposed to "probable."

18          Are there any specific facts alleged

19 either in the notice or in the affidavit that tie

20 either of these two planes to illegal activity -- I

21 mean, something that would say, you know, we believe

22 based upon our investigation that on a particular date

23 the plane was used to transport money to another

24 country for money laundering purposes, or something

25 like that?  Is there anything like that that I'm

1  missing?

2         MR. COLEMAN:  Your Honor, if I may back up

3  just a little bit, my understanding of the law is that

4  the notice and the affidavit attached thereto, it does

5  not have to be so specific -- it doesn't have to be

6  overly specific, just specific enough to put the

7  respondents on notice of the allegations and give them

8  fair notice of what is alleged.

9         But with that being said, the Price

10  affidavit makes mention of the fact that there were

11  documents that were on file with the FAA and

12  maintenance records in the logbook that indicates that

13  these planes in this instance not only were not

14  registered properly under Title 59 of the United States

15  Code, but that they were also, in effect, exported

16  under Title 50 of the United States Code in violation

17  of that code.

18         Effectively, as Title 50 refers to, they

19  were -- the control or effective control was given over

20  to a non-citizen.  And I understand that the

21  respondents may dispute whether or not the trust was a

22  proper document that conveyed the ownership or an

23  interest to a non-citizen.  I submit to the Court that

24  that's a fact question for the trier of fact to

25  determine whether or not it was sufficient.

1            But the crux of what is alleged, I think,

2   is specific enough to convey to the respondents that

3   the allegation relies on whether or not there were

4   registration violations under Title 49 of the United

5   States Code, whether or not there were export

6   violations under Title 50 of the United States Code,

7   and a variety of other criminal offenses, Your Honor,

8   which would include Title 18 Section 1001, which is

9   making a false statement or falsifying to a government

10  entity, which dovetails into the state allegations of

11  wrongful or criminal activity, which includes filing a

12  document by deception and the money laundering and also

13  the engaging in organized criminal activity.

14            I'll state one other thing, Your Honor.

15  And I get the Court's concern about -- and typically,

16  that's where we see the forfeitures is in the context

17  of these drug transactions involving drug dealers.  And

18  as a state prosecutor for more than a decade, I've seen

19  my fair share of cash and cars and drug dealers.  But

20  Chapter 59 is not limited to a drug transaction.

21            THE COURT:  Right.

22            MR. COLEMAN:  Chapter 59, the Code of Criminal

23  Procedure makes it clear that certain enumerated

24  felonies -- which specifically include Chapter 32 of

25  the Penal Code, which is securing execution of a

 1   document by deception; Chapter 34 of the Penal Code,

 2   which is a money laundering statute; and also Chapter

 3   71 of the Penal Code, which is the engaging of

 4   organized criminal activity -- those are specific

 5   enumerated offenses that effectively get you under

 6   Chapter 59, the forfeiture statute, Your Honor.

 7           THE COURT:  And, you know, again, I appreciate

 8   what you are saying.  I'm looking, though, for facts in

 9   the affidavit.  And we may discuss it later when we

10   talk about the 12(b)(6) portion because, you know,

11   this is now in federal court, and so I have to analyze

12   pleadings in conjunction with the mandates of the

13   United States Supreme Court in *Iqbal and Twombly,*

14   whether the pleadings themselves provide sufficient

15   information that would stand scrutiny under our federal

16   rules.

17           But as I look at the affidavit, which is

18   incorporated into the pleadings, it seems as if the

19   connection -- alleged connection, I should say, is

20   based upon -- and I'm looking at paragraph 6 of the

21   affidavit -- based upon defendant's training and

22   experience.  And even if I look at paragraph 23 that

23   you pointed out, it's "I formed the opinion."  It seems

24   as if the facts are based in the mind and\or perceived

25   experience and knowledge of the affiant.  He's not

1   here, but actually, are there some other facts?

2          MR. COLEMAN:  Actually, Your Honor,

3   Mr. Price is here.  He just showed up.

4          THE COURT:  He did?  Okay.

5          MR. COLEMAN:  For the record, he did.

6          THE COURT:  All right.  And then as I look,

7   too, at paragraph 9 of his affidavit, which is

8   included, I guess, for me to consider, he talks about

9   several aircraft under AGC -- and that's this AGC Trust

10  that we're talking about -- are linked to multiple

11  federal investigations for drug smuggling operations

12  and several -- well, that paragraph would suggest that

13  this plane or planes are used in drug smuggling.  And

14  it says for several aircraft, but the affidavit does

15  not specify a Learjet involved here or Cessna plane.

16  What I'm driving at is, how does this affidavit tie

17  these two planes to illicit or illegal activity?

18         MR. COLEMAN:  Yes, Your Honor.  While one

19  could infer from that one paragraph that talks about

20  drug smuggling that perhaps that's an element or a part

21  of this particular case or these cases, the focus --

22  the majority of this affidavit by Mr. Price, for

23  instance, focuses on in paragraph 12 the statutory

24  trust and the fact that it is improper in that it is

25  effectively giving control of this plane, as put forth

1   in Title 50 of the United State Code, to a non-citizen.

2          It also refers to, in paragraph 13,

3   improper registration; and later on in the affidavit,

4   improper registration as reflected in paragraph 17,

5   that there is no data on file with the Electronic

6   Export Information System that would indicate that

7   this plane was properly -- or a license was sought to

8   properly export this plane.

9          THE COURT:  Uh-huh.

10         MR. COLEMAN:  If you skip down to Paragraph

11  19, these are more specific facts here, the fact that

12  this particular plane spent a significant amount of time

13  outside of the United States; which again would lend

14  itself to, as the distinction is made in Title 50, more

15  than just a "temporary sojourn."  This was, in effect,

16  an exportation in violation of the United States Code.

17         And then, Your Honor, there is also some

18  allegations about violation of tax as well.  But this

19  is more than mere conjecture on the part of Mr. Price.

20  Also, he makes reference to an opinion that was sought

21  form the chief counsel from the Department of Commerce

22  that also was incorporated into his determination that

23  he made that he relied on.

24         So I would submit to the Court, while this

25  is not super detailed, a super detailed affidavit, it

1  is fair notice and it's enough notice to put the

2  defense or the respondents on notice that we're alleging

3  violations of Title 49 of the United States Code, Title

4  50 of the United States Code, and numerous violations

5  under Title 18 of the United States Code.

6          THE COURT:  Okay.  And before I let the

7  defendants respond to this segment, I've got some other

8  things I want to ask.

9          But back to this, it's several aircraft

10 that are under these AGC Trusts are used in drug

11 smuggling.  That was put in the affidavit asking this

12 Court to issue an Order of Forfeiture of both of these

13 jets.

14         I can't help but also, in looking at the

15 pleadings before the Court, note in Learjet, document

16 15, which is a supplement to the Motion to Dismiss

17 pursuant to a 12(b)(6), that there is an e-mail from

18 Mr. Price to a Tom McMenamin where a reference is made

19 to both of these jets, the Learjet and the Cessna,

20 stating, "Neither were 'dope jets', both used for

21 personal transport, so they don't look gutted out."

22         Well, this, which is part of a pleading

23 before the Court, this e-mail would tend to refute that

24 anything having to do with this plane being used for

25 drug smuggling, and yet that's part of the affidavit

1 that is presented to me to ask me to cause both of

2 these planes to be forfeited.

3          MR. COLEMAN:  Your Honor, respectfully, I have

4 no control over what Mr. Price put in his affidavit,

5 and Mr. Price chose for whatever reason to put these

6 excerpts in there about drug smuggling, and in some

7 e-mail that is not a part of the pleadings he made

8 reference to a dope plane.

9          I want to be clear with the Court that

10 the crux of the State's argument for forfeiture under

11 Chapter 59, it falls under the violation or violations

12 of Title 49 of the United States Code, the registration

13 requirement; title 50 of the United States Code, the

14 export requirements; and various other criminal

15 statutes, including Title 18 and the state statutes of

16 money laundering, executing a document by deception and

17 engaging in money laundering.

18          That is the basis for which we are asking

19 the Court for relief under Chapter 59, Judge, and

20 regardless of what extraneous references Mr. Price may

21 have made to drug smuggling or dope planes in

22 communications.

23          THE COURT:  All right, thank you, Mr. Coleman.

24          And to the defendants, Mr. Bishop,

25 Mr. Evans, I don't want to necessarily -- I mentioned

1  12(b)(6) and there are some other arguments I think we

2  probably need to discuss about that.  But just based

3  upon this aspect, and I'm focusing on the probable

4  cause aspect of a forfeiture proceeding, do you all

5  have any comments you wish to make as to that at this

6  time?

7         MR. BISHOP:  Thank you, Judge, and I'll be

8  brief.  I think that you hit the nail on the head in

9  that there has been no allegations of any actual crime

10 and no proof or probable cause that either of these

11 jets have been linked or involved in any sort of crime.

12 And we had discussed this at some length at the last

13 hearing, but again, it all goes back to an idea, which

14 is completely erroneous, that because these jets like

15 thousands of other jets are owned through a non-citizen

16 trust, that that, in and of itself, somehow gives

17 Mr. Price probable cause to seize these jets.  That's

18 simply not the case.

19         And in the affidavit there is discussion

20 of, well, at least in my case, Mr. Camarillo is a

21 citizen of Mexico.  As I said last time, that's

22 absolutely true.  There is no affidavit testimony that

23 anything specifically with the registration is

24 fraudulent.  There is no affidavit testimony that any

25 specific documents were fraudulently filed.  It all

1  goes back to this idea, which again is entirely

2  erroneous that the non-citizen trust, which the FAA

3  approved and registered these aircraft through, that,

4  in and of itself, entitles Mr. Price and Polk County to

5  go and seize these jets.

6           And I think what underscores that is one

7  of the other e-mails that was in the supplement that I

8  filed from the documents that I got from Mr. Coleman is

9  Mr. Price's other statement that this is the first of

10  MANY, which is in all caps, jets that they intend to

11  seize.  And I understand that that's not in their

12  pleading, but I think it lays bare the intent here,

13  which is, look, there's --

14           THE COURT:  Well, that was in the e-mail,

15  which is attached to document 15 of Learjet's -- it's a

16  supplemental response -- supplemental motion to

17  12(b)(6), as I recall.

18           MR. BISHOP:  That is correct, Your Honor.

19           THE COURT:  So this is a part of the pleadings

20  before the Court.

21           MR. BISHOP:  Yes.  And to clarify, I meant

22  it's not contained within their Notice of Forfeiture.

23           THE COURT:  Okay, I got it.

24           MR. BISHOP:  But I did file that as an

25  attachment to a pleading.

1          THE COURT:  Okay.

2          MR. BISHOP:  So it is in the papers of the

3   Court.  And I think the significance of that is it lays

4   bare a plan to seize how far many jets that they can

5   get their hands on that are registered through the

6   non-citizen trust.  And there is another part of one of

7   those e-mails, I'm sure, that it didn't escape your

8   attention, where it talks about an auction fee.  So the

9   idea here is, well, without any allegation that there

10  has been any actual crime committed, they would round

11  up all these jets, seize them, seek forfeiture, and

12  auction them off.

13          So that is what is going on, Judge.  But

14  to your questions more specifically about the affidavit,

15  I think that there is nothing within the affidavit

16  which would allow or which would suffice to satisfy

17  their burden.  There are no factual allegations within

18  that affidavit that show that any crime has been

19  committed.  There is a bunch of extraneous stuff about

20  ghost planes and generalities of other investigations,

21  but there is not one single statement in that

22  affidavit -- in fact, in either one -- that would

23  satisfy their burden and show that there is probable

24  cause that these jets are linked in any way to any

25  criminal act that's been committed.

1          So I think it may be your intention to get

2   into the 12(b)(6) a little bit later, but I think that

3   goes to the heart of that motion as well.

4          THE COURT:  I do, yes.

5          Mr. Evans, do you have anything you want

6   to add to that?

7          MR. EVANS:  Just briefly, Your Honor.  We

8   filed a supplement as well.  I've got extra copies if

9   the Court if the Court doesn't have one, and I provided

10  a copy to Mr. Coleman as well this morning.

11         But in the supplement, I spent some time

12  yesterday looking at the FAA registry.  And just five

13  companies identified 7,860 aircraft that are held in

14  trust typically for non-U.S. citizens.  Because if you

15  are a U.S. citizen, there is no problem with

16  registering an aircraft with the FAA.  7,860 aircraft.

17         And the problem that we have with the

18  Price affidavit is just as the Court laid out.  We

19  searched high and low trying to find facts that we

20  could, you know, wrap our arms around and understand

21  the basis upon which the State is seeking to forfeit a

22  million-dollar-plus asset, and we found none.  We don't

23  believe that there is anything that would begin to

24  fulfill the State's burden in that regard.

25         But the biggest problem with the Price

1  affidavit, as well, Your Honor, is that you could make

2  the same vague ambiguous claims against virtually any

3  aircraft on the FAA registry that happens to be held in

4  trust, and there would be no way of separating the

5  wheat from the chaff, so to speak.  So we've got a

6  whole bunch of chaff, not so much wheat, and we don't

7  believe that there is any probable cause, at least that

8  we've been able to ascertain from the Price affidavit.

9          And, of course, we completely agree with

10  my colleague's argument as well, Your Honor.

11          THE COURT:  And if the planes were forfeited,

12  then they would be -- the State would be entitled to

13  auction these planes off; correct?

14          MR. EVANS:  Yes, Your Honor.

15          THE COURT:  And the owners through a trust

16  would lose their possession, right to control, right to

17  use million dollar assets; is that correct?

18          MR. EVANS:  Absolutely, Your Honor.

19          And I'd like to add that the way that

20  these cases have developed is they started off with a

21  non-sworn detention of the aircraft by the Bureau of

22  Industry and Security in both cases, a couple of

23  individuals that are employed by that agency in the

24  Houston area.  And so they'll come in and detain the

25  aircraft and say, you know, "We're looking at your

 1  aircraft, possible export violations," but there is no

 2  probable cause, there is no affidavit, there is no

 3  sworn instrument of any kind.

 4          THE COURT:  Who does this?

 5          MR. EVANS:  The Bureau of Industry and

 6  Security, Your Honor.

 7          THE COURT:  Is that a federal?

 8          MR. EVANS:  Yes, Your Honor, it's a segment of

 9  the Department of Commerce.

10          THE COURT:  But that's not what happened here,

11  was it?

12          MR. EVANS:  Yes, Your Honor.

13          THE COURT:  Okay.

14          MR. EVANS:  In both cases they started off

15  with a detention of the aircraft --

16          THE COURT:  Okay.

17          MR. EVANS:  -- without any sworn affidavit,

18  any sworn instrument, which raises our concerns, as we

19  put in our pleadings, about the entire application of

20  the Fourth Amendment.  Because in our case the citation

21  was detained for over six months under the auspices of

22  a BIS (Bureau of Industry and Security) investigation.

23  And then when BIS was finished with this inquiry and

24  concluded that nothing untoward was happening with the

25  aircraft, the aircraft was summarily released to Mr.

1  Coleman and his colleagues for prosecution.  And so

2  that's how the aircraft are being detained for an

3  extended period of time.

4        THE COURT:  Okay, this department released its

5  hold on the airplane?

6        MR. EVANS:  Yes, Your Honor.

7        THE COURT:  At that point could your client

8  have flown off to Hawaii in it or wherever they want to

9  go?

10        MR. EVANS:  If they had any understanding as

11  to when that was going to occur, Your Honor,

12  conceivably.  But basically, they were informed, "We're

13  finished with your aircraft, and if you need to have --

14  if you would like to, you know, have anything to do

15  with your aircraft, go see Mr. Coleman and his

16  colleagues because we turned it over to the State of

17  Texas."

18        THE COURT:  Okay.

19        MR. EVANS:  So that was uninterrupted

20  continued detention of the aircraft.

21        THE COURT:  Okay.  So that's something that

22  precedes this.  But that really -- the issues you

23  raised about a Fourth Amendment violation, that's not

24  the State of Texas.  The State of Texas did not do

25  that; correct?

1    MR. EVANS:  Correct, Your Honor.

2    THE COURT:  So, I mean, I appreciate the

3 background information.  But to the extent you may

4 claim a constitutional violation, that would be by a

5 department of the Federal Government that is not before

6 the Court right now; is that correct?

7    MR. EVANS:  Yes, Your Honor.

8    THE COURT:  We are here simply on the

9 forfeiture proceeding under Texas Code of Criminal

10 Procedure 59; correct?

11    MR. EVANS:  Yes, Your Honor.

12    THE COURT:  All right.  And I am analyzing --

13 I'm not discounting any of the prior statements or

14 concerns that you have made regarding whether those

15 investigations by a department of the Federal

16 Government are valid or not.  I don't need to focus on

17 that to make a decision in this case; correct?

18    MR. EVANS:  No, Your Honor, I just wanted the

19 Court to be aware of --

20    THE COURT:  Yes.

21    MR. EVANS:  -- the process that was involved.

22 And actually, the first step that the State took was to

23 articulate in the Price affidavit what we still

24 consider to be a complete absence of probable cause to

25 continue the detention of the aircraft.

```
 1              THE COURT:  Okay, thank you.  Is there
 2  anything else you wanted to add?
 3              MR. EVANS:  No, Your Honor, thank you.
 4              THE COURT:  Okay.  I want to now shift --
 5  these are some questions that I have.  And then I do
 6  want to let you all have, when I get through this, an
 7  opportunity for you all to kind of go back to your
 8  mainline arguments in the case.  Although you may, if
 9  you've already made some of those comments, you might --
10  I mean, I'll let you decide how you want to offer your
11  arguments.  And if I hear some repetition, that's fine.
12              But I now want to go back to -- I'm
13  leaving this concept of probable cause and now I'm
14  focusing, though, on this statute, Code of Criminal
15  Procedure, Article 59.  Let me make sure we're clear.
16  Mr. Coleman, is there any question that that is the
17  statute that I am obligated to follow if I am to grant
18  a forfeiture of these planes?
19              MR. COLEMAN:  That is correct, Your Honor.
20              THE COURT:  Because, as a federal court
21  sitting in Texas, I have to apply the law of the state;
22  correct?
23              MR. COLEMAN:  That's correct, Your Honor.
24              THE COURT:  All right.  Is there any
25  disagreement in that concept, Mr. Bishop and Mr. Evans?
```

```
1            MR. BISHOP:  No, Your Honor.

2            MR. EVANS:  No, Your Honor.

3            THE COURT:  Okay.  Now, there is something

4   that has come to my attention that was not briefed by

5   either party -- either side, I should say.  And

6   certainly, I'm going to raise this now.  And if you all

7   need some additional time to submit some follow-up

8   briefs, I'm certainly going to allow it.

9            But since you've told me that I must

10  follow Article 59 of the Texas Code of Criminal

11  Procedure, I'm mindful of the fact that under Article

12  59.04(b) of that statute, a forfeiture proceeding --

13  it says, "A forfeiture proceeding commences under this

14  chapter when the attorney representing the state files

15  a notice of the seizure and intended forfeiture in the

16  name of the state with the clerk of the District Court

17  in the county in which the seizure is made."

18            Now, my question, Mr. Coleman, you are the

19  attorney who filed this on behalf of the State and you

20  filed it in the district clerk in Polk County; is that

21  correct?

22            MR. COLEMAN:  That's correct, Your Honor.

23            THE COURT:  All right.  And it was removed to

24  Federal Court, we've discussed that.

25            Question:  Was the seizure of either of
```

30

1  these two planes made in Polk County?

2          MR. COLEMAN:  No, they weren't, Your Honor.

3  However, my understanding of Chapter 59 -- and forgive

4  me for not being able to cite the exact portion of 59

5  where it states this -- is that the State is also

6  entitled to bring a forfeiture action in the county in

7  which a criminal action could be pursued, if we chose

8  to pursue it.  And forgive me again, I don't have that

9  statute in front of me.

10         THE COURT:  Okay, I understand.

11         And let me just ask a generic question

12 here.  I don't see it pled, I don't see it in an

13 affidavit, so I'm just asking, is there -- because if I

14 were even to allow you to replead, could you in good

15 faith replead and perhaps even proffer evidence that

16 either of these two planes were ever in Polk County,

17 flew over Polk County?  Do you have any evidence of

18 that or anything you could plead?

19         MR. COLEMAN:  Well, Your Honor, certainly I

20 would ask that the Court allow me, if you are so

21 inclined, to supplement my -- or amend my pleading.

22 But I'll concede that these planes, to my knowledge,

23 have never been to Polk County.

24         THE COURT:  Okay, that's fine.  The reason I

25 ask that, there are a couple of cases.  In fact, my

1  good friend, Judge Zeke Zbranek, over in Liberty County

2  utilized this statute to forfeit a motorcycle.  And the

3  Court of Appeals reversed him under this very article,

4  saying, "As we (the Court of Appeals) read Article

5  59.04 of the Texas Code of Criminal Procedure, Notice

6  of Seizure and Intended Foreclosure must be filed in

7  the District Court in the county in which the seizure

8  was made."  And so the seizure of that Harley Davidson

9  motorcycle was deemed inappropriate.  That case, by the

10 way, is cited *1976  Harley Davidson Motorcycle vs.*

11 *State of Texas,* 106 S.W.3d, 398.

12         There is also the case of *Martinez vs.*

13 *State,* which is 893 S.W.2d, 304, where it states, again

14 using this same article, "The State shall commence

15 proceedings within 30 days of seizure and it must be in

16 the Notice of Seizure and Forfeiture" -- which is what

17 the underlying pleading is here -- "must be filed with

18 the clerk of the District Court in the county in which

19 the seizure is made."  And in that case the State of

20 Texas asked the judge to go forward.  And the Court of

21 Appeals said no and, "We hold that the jurisdiction of

22 forfeiture is governed by statute and notice must be

23 filed as prescribed by the statute in the county where

24 the property was seized, reversed and rendered."

25         Again, I'm going let you all, if you need

1  it -- and you may not have been expecting this today, I

2  don't know, and I'll let you all comment, too --

3  provide the Court with some supplemental briefing on

4  this.  But, I mean, how do I get around that statute?

5          MR. COLEMAN:  Your Honor, if I may respond.  I

6  was able to find at least a couple of references under

7  Chapter 59 that talk about filing a forfeiture statute

8  or filing a forfeiture action in the county in which

9  the venue exists for prosecution.

10          I'll direct the Court to -- well, before I

11  direct the Court to those specific citations in Chapter

12  59, I'd like to direct the Court to our Notice of

13  Seizure and Intended Forfeiture chapters -- or paragraph

14  6 and paragraph 7.  Under paragraph 6, we allege, under

15  Chapter 59.023 of the Code of Criminal Procedure -- in

16  the alternative, we allege a suit for what's called

17  "proceeds" under Chapter 59.  My understanding is that

18  not only can you have a forfeiture action for the

19  property, but for a financial -- or for the proceeds

20  assigned to this particular criminal action.

21          And under Chapter 59.023, paragraph

22  (a)(3), it says specifically that an action may be

23  brought in "the county in which venue existed for

24  prosecution of an underlying offense for which the

25  property is subject to forfeiture."  That's one

1   reference in Chapter 59 of an instance where we --

2        THE COURT:  What was that last citation?

3        MR. COLEMAN:  It was 59.023.

4        THE COURT:  Wait.

5            *(Pause)* Suit for Proceeds?

6        MR. COLEMAN:  Yes, sir.

7        THE COURT:  Is this a Suit for Proceeds?

8        MR. COLEMAN:  We've pled that, Your Honor, in

9   the alternative under paragraph 6.

10       THE COURT:  It said proceeds were gained --

11  well, proceeds gained from the commission of an

12  offense, wouldn't that be something like, if they sold

13  some cocaine or marijuana or meth or some other

14  horrible drug and they sat there with a pile of money,

15  you could go after that pile of money?

16       MR. COLEMAN:  In the traditional sense, Your

17  Honor.  However, the State's position is that the term

18  of "proceeds" is not limited to that instance.  In

19  fact, the money laundering statute under Chapter 34

20  refers to either financing or investing in a financial

21  enterprise or property.

22       THE COURT:  Okay.

23       MR. COLEMAN:  And that would be the State's

24  position is that "proceeds" is expanded to fit that

25  definition.

1      THE COURT:  But right now, in terms of -- and

2  I have to admit, and I welcome additional briefing on

3  this subject, but proceeds, a Learjet or a Cessna jet

4  sitting on a runway would not be proceeds; is that

5  fair?

6      MR. COLEMAN:  Your Honor, I would respectfully

7  disagree with the Court on that.  It's the State's

8  position that that particular aircraft was the proceeds

9  of either investing in or financing this scheme --

10      THE COURT:  Okay.

11      MR. COLEMAN:  -- this criminal enterprise that

12  consisted of a sham trust that turned over what is

13  referred to in Chapter 15 of the Code of Federal

14  Registry, Section 740.15 -- which turned over

15  effectively operational control to a non-citizen, Your

16  Honor.

17      THE COURT:  Okay.

18      MR. COLEMAN:  I would also like to direct the

19  Court's attention to paragraph 7 of our Notice of

20  Seizure, which again pleads in the alternative that

21  under Chapter -- well, while it's not specifically

22  cited here, under Chapter 59.022 of the Code of

23  Criminal Procedure, the forfeiture statute, it talks

24  about property that had been removed from the state.

25  Again, under paragraph B3, there is another reference

1  that a forfeiture action could be brought in the

2  county in which venue existed for prosecution of the

3  underlying offense, for which the property is subject

4  to forfeiture.

5        THE COURT:  Okay.  This property has not been

6  removed from the State of Texas, though, I mean; right?

7  I mean, it's in Brownsville or some place; right?

8        MR. COLEMAN:  Yes, Your Honor, currently.  The

9  State's position is that it had been removed from the

10  state.  And even more than that, Judge, there are at

11  least two references in this Chapter 59 statute that

12  talks about a forfeiture being able to be brought in a

13  county in which the underlying criminal offense could

14  have been prosecuted.

15        It's the State's position that it is not

16  an offense -- it is -- the statute, in its intent,

17  legislative intent, is not offended by use being able

18  to bring a forfeiture action in the county in which we

19  could have otherwise prosecuted the defendant for the

20  underlying offense.

21        THE COURT:  Yeah, I appreciate your comment.

22  I would just note, Article 59.022 subpart (a) says,

23  "This article applies to contraband, other than real

24  property, that is determined to be located outside of

25  this state."  So I think right now this property is not

1  outside of the state; is that fair?

2          MR. COLEMAN:  That's correct, Your Honor.

3          THE COURT:  Okay, I appreciate your comments

4  on that.  Again, I may have sprung this issue on you

5  all because I didn't see it briefed, and I do welcome

6  additional briefing on it by both sides, but I'll allow

7  the defendants to make comment about this issue that

8  I've raised.

9          MR. EVANS:  May it please the Court, Your

10 Honor?

11         THE COURT:  Yes.

12         MR. EVANS:  We agree that -- we raised this

13 issue in our Motion to Dismiss on behalf of the

14 Citation in somewhat of a circuitous manner because we

15 styled it as improper venue.

16         THE COURT:  Well, we're going to talk about

17 that in a minute, but go ahead.

18         MR. EVANS:  And we remain perplexed, Your

19 Honor, as to how the State saw fit to bring suit in

20 Polk County to begin with.  Polk County has --

21         THE COURT:  Is this substantive or procedural?

22         MR. EVANS:  I think it's a little bit of both,

23 Your Honor.

24         THE COURT:  Uh-huh.

25         MR. EVANS:  Because in our view, the aircraft

1  was clearly seized in Southern Texas, in Cameron County.

2            THE COURT:  The Cessna was?

3            MR. EVANS:  Yes, Your Honor.

4            THE COURT:  Do you know about the Learjet?

5  Was it also seized down there?

6            MR. BISHOP:  Your Honor, both of them were

7  seized at the Brownsville Airport, which is Cameron

8  County.

9            THE COURT:  Okay, that's all I need to know,

10  yeah.  Okay, good.  Continue on.

11            MR. EVANS:  And the citation was subsequently

12  relocated by the State or by BIS.  I think it was

13  probably BIS at the time, from Brownsville to Harlingen.

14            THE COURT:  Who did that?

15            MR. EVANS:  It was either the Bureau of

16  Industry and Security or it was --

17            THE COURT:  Okay.

18            MR. EVANS:  I suspect they had control over

19  the aircraft at the time.  This is Mr. Mr. McMenamin,

20  which appears in the e-mail the Court referred to.

21            THE COURT:  Okay.

22            MR. EVANS:  And so our reading is consistent

23  with the Court's interpretation that the suit should

24  have been brought in the Southern District -- you know,

25  in the county in which the seizure took place.  So that

1   would be Cameron County, and that we don't see how

2   venue would be proper in Polk County.  And also, even

3   if the aircraft -- well, none of these underlying

4   activities, Your Honor, took place or could have had

5   some type of criminal impact in Polk County.  Because

6   to the extent the State is complaining about the manner

7   in which the aircraft was held in trust by a non-U.S.

8   citizen, that goes squarely to the FAA and how it

9   orchestrates and permits the ownership of aircraft by a

10  non-U.S. citizen.

11          THE COURT:  If we assume for the sake of the

12  argument -- and I think in considering pleadings, I

13  must take as alleged whatever is true -- your Cessna

14  plane you represent was registered improperly in

15  violation of every single federal aviation regulation

16  known to the United States Government.  Let's just

17  assume that, okay?  Therefore, it needs to be seized;

18  right?

19          Under this statute, the Notice of

20  Forfeiture and Seizure would have to be filed in the

21  county where the plane was seized, and that's assuming

22  that it violated all the regulations of FAA?

23          MR. EVANS:  That is exactly our understanding,

24  Your Honor.

25          THE COURT:  Okay.  So that the State of Texas,

1  which presumably operates in all 254 counties, and

2  their U.S. Attorneys that also operate -- you know, we

3  have four districts, and their U.S. Attorneys, if they

4  were working in conjunction with either state

5  prosecutors or federal prosecutors, they could come in,

6  in one of 254 counties in Texas and seize -- file it

7  within 30 days after they seized it in whatever of the

8  254 counties; correct?

9         MR. EVANS:  Yes, Your Honor.  In fact, if I

10  could point out, this doesn't relate to this

11  proceeding, but in an unrelated case that's exactly

12  what the State has done.  They seized a Hawker aircraft

13  worth about two and a half million dollars on the

14  ground at Hobby Airport.  In that case, that case was

15  properly filed in Harris County, Texas.

16         THE COURT:  Okay.

17         MR. EVANS:  Because the aircraft that was

18  seized, it's physical location was Hobby Airport in

19  Harris County.  That case has been removed to the

20  Southern District.

21         THE COURT:  True.

22         MR. EVANS:  So that tracks Rule 59, in our

23  view, as far as where the proceeding should have been

24  brought.

25         THE COURT:  So, under that situation, then,

1  the Court -- if that was filed in 30 days and it is

2  removed to Federal Court and assuming everything else

3  is appropriate to issue a seizure and forfeiture, the

4  Federal Court in the Southern District could so order;

5  correct?

6           MR. EVANS:  Yes, Your Honor, presumably.

7           THE COURT:  Okay.

8           All right.  Mr. Bishop, do you have any

9  further comments on that?

10          MR. BISHOP:  Well, I don't want to echo what

11 Gary just said, but I do think that even though this

12 wasn't in the briefing, the fact that there was not a

13 Notice of Seizure filed in -- and it would either be

14 in Cameron County, or I think Harlingen is in Willacy

15 County, one of those two counties, wherever the State

16 seized the plane -- within 30 days, because they did

17 not do that and because we know neither aircraft has

18 been removed from the state, and I think the idea that

19 somehow these aircraft are proceeds, number one, I

20 don't think it applies, and even if it did apply,

21 wouldn't allow for these notices to be filed in Polk

22 County.  Because of the notice of -- before we even get

23 to all the other questions, the Notices of Seizure that

24 were filed on their face and according to Chapter 59,

25 are defective.

1           THE COURT:  I'm curious.  I asked that

2  question, is it procedural or substantive?  And again,

3  I've been kind of holding off on this 12(b)(6)

4  analysis.  But it seems like every time we kind of

5  start rubbing up on it, you know.  And I kind of saved

6  12(b)(6) for last, you know, but we kind of keep

7  rubbing on it a little bit here.  Would that be

8  something that in a Notice of Seizure you would have to

9  plead and then offer some evidence on?  I'm talking

10 about the seizure part.

11          MR. BISHOP:  Well, you mean in --

12          THE COURT:  In other words, to ask a Court to

13 seize a plane, you would have to say, "Court, we're

14 asking to seize this plane and forfeit it, and that's

15 what this pleading is.  And yes, we filed it in Polk

16 County because that's where the plane was seized."

17 Would that be part of the element of proof you would

18 have to prove -- you would have to make in order to be

19 successful in a forfeiture and seizure proceeding?

20              I know I'm asking these question and maybe

21 I need to give you guys little more time to brief this

22 for me, but I'm just asking, what do you think?

23          MR. BISHOP:  Well, I think it is, Judge, and I

24 think that Chapter 59 is clear that 30 days in the

25 county, and --

1          THE COURT:  I mean, I think of a lot of other

2   pleadings or like conditions precedent have been -- all

3   that stuff has to be pled before you can hit pay dirt

4   on your deceptive trade practice claim or whatever it

5   is you're seeking.  Do you know what I mean?  It's

6   part of the elements of proof to get to a successful

7   resolution for the plaintiff.

8          MR. BISHOP:  That's right, Judge.  And I think

9   that because in this instance the notice was not filed

10  under 5904, and I haven't briefed it --

11         THE COURT:  I understand.

12         MR. BISHOP:  -- but I certainly don't believe

13  that any of the exceptions or in other circumstance

14  provisions of that code, of Chapter 59, would take it

15  out of that.  I do think that because they didn't do

16  that, they could never be successful under Chapter 59.

17         THE COURT:  Mr. Coleman, would there be -- I

18  can't think of a way to put the cork back into the

19  champagne.  Is there -- you know, and I'm rubbing up on

20  this 12(b)(6) issue, I've been saving it for last, but

21  is there some way, if you were allowed to replead, you

22  could ever replead facts that would in good conscience

23  allege that the plane was seized in Polk County or any

24  other county within the Beaumont Division of the

25  Eastern District of Texas?

1          MR. COLEMAN:  Well, first of all, Your Honor,

2   I'd like to point out that in paragraph 1 and paragraph

3   2 of the Notice of Seizure, under paragraph 1 it says

4   this proceeding is brought by virtue of Chapter 59 of

5   the Code of Criminal Procedure.  It doesn't limit

6   itself to any one specific section of Chapter 59.  It

7   just says by virtue of Chapter 59.

8          Paragraph 2 goes on to state that

9   jurisdiction is conferred by virtue of not only the

10  Texas Constitution, but also Article 59 of the Code of

11  Criminal Procedure.

12          So, if it's pled, at least the condition

13  precedent, in my opinion, it's pled generally or

14  broadly here, Your Honor.  And if the Court is not

15  inclined to go along with the argument of jurisdiction

16  is conferred under Chapter 59.04(b), then again

17  alternatively, the State has pled --

18          THE COURT:  The proceeds.

19          MR. COLEMAN:  -- the proceeds under 59.023 of

20  the Code of Criminal Procedure, which clearly allows a

21  suit to be brought in the county in which the criminal

22  prosecution could have been sustained.

23          THE COURT:  Okay, I may allow both sides some

24  additional time to file some supplemental briefing on

25  this, if you think it would be helpful.  I know time is

1  of the essence with these planes.  If I were to allow

2  that, would seven days be sufficient amount of time for

3  you all to get in some supplemental briefing on this to

4  the Court?

5          MR. COLEMAN:  That's enough time for the

6  state, Your Honor.

7          MR. EVANS:  Certainly, Your Honor, for the

8  citation.  I don't want to speak for Mr. Bishop.

9          MR. BISHOP:  That's plenty of time, Judge.

10  Thank you.

11         THE COURT:  Okay.  I just raise this point.

12  Now, I do want to just ask something, and maybe this

13  is overkill, I don't know, but I ask this to the

14  defendants.  Under your 12(b)(2) -- your 12(b)(2)

15  motion, I must say, isn't this an *in rem* action?

16         MR. EVANS:  It is absolutely an in rem action,

17  Your Honor.  And, you know, that pleading was filed

18  very early on.  We have a very short period of time to

19  file a Motion to Dismiss.

20         THE COURT:  Didn't want to waive it?

21         MR. EVANS:  Yeah, we can certainly waive that

22  with respect -- yeah, it is *in rem.*  But I might also

23  note for the Court that, you know, if the State truly

24  believes that there is some type of criminal activity,

25  you know, tearing at the very fabric society, which

1   seems to be the allegation here, it should be noted

2   that we're not aware of any criminal indictments

3   against any of the folks that -- you know, they list

4   these other individuals and entities in the pleading

5   because they may have a property interest in the

6   aircraft of some kind or nature.

7          But there are no related criminal

8   proceedings, which I believe it supports what

9   Mr. Bishop was saying earlier, is that this, you know,

10  this is an action in conversion and selling of very

11  valuable assets.  But with respect to the *in rem,* yes,

12  Your Honor, it is over the aircraft, and we don't

13  really reach the issues of personal and specific

14  subject matter jurisdiction.

15          THE COURT:  Because an *in rem* action, really,

16  jurisdiction of a person is really irrelevant.  It's

17  whether the Court has jurisdiction over the thing;

18  right?

19          MR. EVANS:  Agreed, Your Honor.

20          THE COURT:  Okay.  Mr. Bishop, do you have any

21  further comment on that?

22          MR. BISHOP:  No, I echo Mr. Evans' comments.

23          THE COURT:  Mr. Coleman, I don't know that

24  there is a need to respond to that.  I think they've

25  pretty much kind of --

1        MR. COLEMAN:  If I could just briefly, Your

2   Honor.  You know, with regard to any criminal

3   prosecution, I think the operative term that Mr. Evans

4   used was that he's "not aware of" that there are any

5   criminal indictments or criminal investigations that

6   are forthcoming.  But just to be clear, it is not

7   necessary to have an actual criminal case to proceed

8   under Chapter 59 of the Code of Criminal Procedure.

9        THE COURT:  Okay, thank you very much.

10        Also, I want to just briefly touch on this

11   venue issue that's been raised under 12(b)(3).  Section

12   1441(a) expressly provides that the proper venue of a

13   removed action is the District Court of the United

14   States for the district and division embracing the

15   place where such action is pending.  I mean, the

16   defendants removed this case to me or to this court.

17   Polk County is in the Beaumont Division of the Eastern

18   District of Texas.  Again, is there really -- is the

19   venue really disputed here?

20        MR. EVANS:  No, Your Honor.

21        LAW CLERK:  The Lufkin Division.

22        THE COURT:  Oh, excuse me, I misspoke.  Thank

23   you.  We are sitting in Beaumont.  This is a Lufkin

24   Division case and Clara Brown is my Lufkin Division Law

25   Clerk.  Actually, she's Judge Ron Clark's law clerk.

1  But Judge Clark is gracious enough to allow me to

2  utilize her many talents and insights.  And so this is

3  a Lufkin case.

4            So, for the record whenever I have spoken

5  of this being in the Beaumont Division, I would like

6  the record to be clear, I spoke improperly.  I made a

7  mistakes.  This is the Lufkin Division, not the

8  Beaumont Division.  Can we get that clear for the

9  record?  Any objection to that clarification for the

10 record?

11           MR. COLEMAN:  No objection from the State,

12 Your Honor.

13           MR. EVANS:  No objection, Your Honor.

14           MR. BISHOP:  No objection.

15           THE COURT:  Okay, thank you very much.

16           I like Lufkin and I like to try cases up

17 there, but I guess I was looking at my Beaumont

18 courtroom here and got carried away with Beaumont for

19 the purposes.

20           All right, but back on the venue issue,

21 that's really not that big of a deal any more?

22           MR. EVANS:  No, it's not, Your Honor.

23           THE COURT:  Okay.

24           MR. EVANS:  Under the Federal Rules, there are

25 just precious few opportunities to raise concerns over

1  where the case was removed.  You know, in our view, it

2  should have been brought in Cameron County and it would

3  have been removed to the Southern District.  So it was

4  our way of going about and trying to raise that issue.

5          THE COURT:  Of course.

6          MR. EVANS:  We don't want to be viewed as

7  trying that issue by consent.

8          THE COURT:  Right.  Well, ultimately, on

9  decisions like this, this is why I want to clear away

10  some of this stuff so we know what we need to focus our

11  attention on and not, because I don't want any motions

12  lingering on that don't get addressed.

13          So, Mr. Bishop, on the 12(b)(3)?

14          MR. BISHOP:  I will adopt what Mr. Evans said.

15          THE COURT:  Okay.  And on the 12(b)(1), while

16  we're just kind of talking about this, now, the

17  argument is that there is no case or controversy

18  because the issues are no longer alive because the

19  airplane's ownership and operation is legal and

20  complies with FAA regulations.  Well, that's part of

21  what the State is saying is not appropriate.  I mean,

22  that's -- am I missing something on that?

23          MR. BISHOP:  Judge, no, I think you are

24  exactly right, and I think the issues, I think my

25  motion and Gary's are similar on that point and make

1  essentially the same point that, look, the FAA scheme

2  is entirely legal and valid because both of these

3  aircraft have been registered under that.

4          THE COURT:  But in terms of dismissing a case

5  under 12(b)(1) when the State is saying, well, there

6  are some issues with regard to the legality and the

7  compliance of FAA regulations, I mean, it would be

8  difficult for the Court to dismiss under 12(b)(1),

9  don't you think?

10         MR. BISHOP:  Well, yes.  And I might suggest

11 that 12(b)(6) would be the more appropriate dismissal.

12 And I think that what I had both read and heard from

13 the State --

14         THE COURT:  Is that there is a failure to

15 state a claim?

16         MR. BISHOP:  That's correct.  And the claim

17 that they have stated is not that there is anything

18 wrong with these registrations in and of themselves.

19 It is simply because they are registered as non-citizen

20 trusts, therefore, they are illegal.  And that simply

21 doesn't give rise to any criminal offense, much less

22 forfeiture or seizure under Chapter 59.

23             So I do think it's important -- and I

24 understand that the Court will look at the pleadings,

25 but I think it's important to note that what we have

1    here is simply a blanket claim, and I think Mr. Coleman

2    mentioned it's a sham trust, a scheme that turned over

3    operational control to a non-citizen.  That's what he

4    mentioned in argument.

5                But, Judge, there is no allegation of what

6    makes either trust a sham trust.  And in fact, what we

7    know is that --

8                THE COURT:  Well, that would be more of a

9    *Iqbal Twombly* argument, which should come under

10   12(b)(6), not under 12(b)(1).  Fair?

11               MR. BISHOP:  I agree, Your Honor.

12               THE COURT:  So, just so I can kind of clear my

13   mind of this, really, there is no need really for the

14   Court to focus on, with all respect, the 12(b)(1),

15   12(b)(2) and 12(b)(3) positions in your Motions to

16   Dismiss; is that fair?

17               MR. BISHOP:  Yes, that's fair, Judge.

18               THE COURT:  And Mr. Evans, I think you agree

19   with that?

20               MR. EVANS:  Agreed, Your Honor.

21               THE COURT:  Okay.  Mr. Coleman, I think that

22   we don't we need to have argument on 12(b)(1) --

23               MR. COLEMAN:  No.

24               THE COURT:  -- 12(b)(2) and 12(b)(3).  Do you

25   agree?

1                MR. COLEMAN:  I agree, Your Honor.

2                THE COURT:  All right.  Now, okay, I'm sorry,

3    I may have thrown everybody's rhythm off a little bit.

4    I've talked about some things -- asked questions about

5    some things, I should say, that bump up on 12(b)(6) and

6    I've heard various attorneys here make reference to it.

7                I guess that you all may want to focus on

8    the 12(b)(6) motion, but I'm also going to, as they

9    said in the television show at the end of THE OUTER

10   LIMITS, "We now return control of your television set

11   to you."  I don't know if you remember that, but I now

12   turn control of this hearing over to you all and let

13   you make your comments.  Now, a lot probably of your

14   arguments may have already been made, I'm not sure, but

15   that's okay.  We've had discussion on some things that

16   were of concern to me on the front end.

17               Mr. Coleman, would you like to proceed?

18   Actually, I think it would probably be best to --

19               MR. COLEMAN:  It's their motion, Your Honor.

20   I'm happy to respond.

21               THE COURT:  It's their motion, that's correct.

22               MR. COLEMAN:  I'm happy to respond.

23               THE COURT:  And why don't we -- let's focus on

24   the Motion to Dismiss.  The Motion to Remand has been

25   withdrawn, and let's talk about the Motion to Dismiss.

1   And then after that, I will let you all go ahead, since

2   you are here, and talk to me about your Protective

3   Order and the Motion for Access, should that be

4   necessary.  All right.

5            MR. BISHOP:  Thank you, Judge.

6               With respect to the 12(b)(6), I'll try not

7   to rehash everything that's been said both today and a

8   couple of weeks ago.  But I think that the reason the

9   dismissal is proper under 12(b)(6) is there simply is

10  nothing in the pleading, no allegation that gives them,

11  that stated a claim upon which relief can be granted.

12               The relief that they want is forfeiture of

13  the aircraft.  And the only allegation that they have

14  made, I'd say, with any facts behind it is that these

15  aircraft, in both cases, are registered and owned

16  through a non-citizen trust.  That's it.  That's the

17  only thing that is in their pleading.  They claim that

18  because they are owned through a non-citizen trust,

19  that that links these aircraft into the criminal

20  statutes that they cited and also somehow is a

21  violation of export law, without providing any details

22  of that.  That's simply not the case.

23               And Mr. Evans mentioned earlier that he

24  did a quick search of just five trust companies and

25  found almost 10,000 aircraft that are registered

1  through these trusts.  The FAA regulations set out how

2  these trusts need to be set up.  And I know at least in

3  my case, and I think in Gary's aircraft as well, we've

4  attached to our motion a letter from the Office of

5  Counsel of the FAA in which Mr. Webster, Senior

6  Attorney for the FAA, reviewed the trust documents,

7  reviewed the filings, the ownership structure, and

8  specifically approved the trust documents for the

9  Learjet.

10           So what we know is that the non-citizen

11 trust is commonly used, and the whole point of the

12 non-citizen trust is such that a non-U.S. citizen can

13 registered an aircraft in the United States through the

14 FAA and get an N number, a tail number.  So, of course,

15 the aircraft is used and controlled by a non-citizen.

16 That's the point of the non-citizen trust.

17           Mr. Coleman says that's a violation of

18 export laws because now the aircraft is controlled by a

19 non-citizen.  So it's a nonsensical circular argument

20 that really goes back to the fundamental flaw, which is

21 the State's idea that any aircraft -- and this must be

22 their idea -- that any aircraft registered through the

23 non-citizen trust ownership regime somehow is a sham

24 trust and a criminal enterprise and subject to seizure,

25 forfeiture, and auction by Polk County.

1           There is no basis for that in the law.

2    Even if every fact that is in Mr. Price's affidavit --

3    and a lot of them are totally irrelevant anyway.  But

4    even if all the facts are taken as true, there simply

5    is no legal basis for forfeiture of the aircraft.  It's

6    complete.  The registration is valid, the registration

7    mechanism and regime is provided under federal law and

8    FAA regulations, and it was specifically, I'll say,

9    approved by the Office of Counsel.

10           So I think it's important not only for my

11   client that obviously needs his aircraft released,

12   which has been entirely unlawfully seized and kept for

13   the better part of a year now, but I think it's also

14   important that this case be dismissed to prevent the

15   MANY other aircraft from being seized on the very same

16   grounds.

17           So, for those reasons -- and Mr. Evans may

18   want to speak some to his aircraft or generally, but

19   for those reasons, Judge, a dismissal under 12(b)(6) is

20   the proper dismissal in this case.

21           THE COURT:  Okay.  Mr. Evans.

22           MR. EVANS:  May I have a change of venue to

23   the podium?

24           THE COURT:  You certainly may.  That's kind of

25   hard on -- you know, when I got in here, we had these

 1  tables going in an opposite direction and I saw about

 2  half the lawyers were sitting through these proceedings

 3  like this, because their backs were to me.  That's

 4  terribly uncomfortable.  So I changed it.  So now

 5  everybody can kind of at least look in this direction

 6  without having to strain their neck.

 7          But I notice when people -- you have to

 8  speak in these microphones and it's hard to bend over

 9  and it gets a little tiring.  So that's what the podium

10  is for.

11          MR. EVANS:  I thank you, Your Honor.  And my

12  cervical spine thanks you.

13          Your Honor, I don't want to repeat

14  anything Mr. Bishop had to say, other to say I agree

15  100 percent with his comments about the system.  I've

16  been very privileged to be involved in aviation for 48

17  years.  About 24 of those years was involved -- I was

18  what they call a line pilot out there flying these

19  types of aircraft every day, including the predecessor

20  to the Learjet and also the predecessor to the Cessna

21  Citation.  They are marvelous business assets, and both

22  of these companies use these aircraft specifically for

23  business purposes, hence Mr. Price's comment that they

24  seem to be an executive configuration.

25          Well, clearly, they are.  And just as

 1  clearly, they are not dope jets.  And I think based on

 2  the e-mail traffic, it's pretty clear also that Polk

 3  County and others saw a very large ray of dollar signs

 4  when they saw these aircraft tracking their previous

 5  efforts with oilfield type of tooling that have been

 6  confiscated and sold to benefit various law enforcement

 7  agencies.

 8          But I'd like to visit just for a second,

 9  Your Honor, on the --

10          THE COURT:  Before you do that, just so I'm

11  clear, for a number of years you've represented people

12  who own these types of aircraft?

13          MR. EVANS:  Yes, Your Honor.

14          THE COURT:  And, you know, most people go

15  about their day-to-day business when they are flying on

16  business, they fly commercial airlines and they hope

17  and pray that they get to be in either group one or

18  group two, or they are flying Southwest and they hope

19  they don't get like number 78 or something.  Right?

20          MR. EVANS:  Absolutely, Your Honor.

21          THE COURT:  But then there are some people,

22  business executives and what have you, who, I'm not

23  saying their time is more valuable than anybody else's,

24  but their time is pretty valuable and they need to get

25  to where they are going in order to do business deals

 1   that create jobs and promote commerce.  Is that fair?

 2           MR. EVANS:  Absolutely, Your Honor.  In fact,

 3   this is a large segment.  We've had our firm -- we are

 4   a law firm that deals almost exclusively with aviation

 5   matters.  And we formed it in 1999 in Texas.  And we've

 6   dealt -- I've had the opportunity to serve as a trustee

 7   for an aircraft owned by a citizen of Mexico.  They

 8   didn't have time to wait on a bank, so I held my hand

 9   up and I said, "Hey, you want me to be the Trustee?"

10           I owned a Citation Mustang for a year and

11   a half.  And then they said, "We're going to sell it."

12           And I said, "Great, let's go sell it," and

13   that was history.

14           THE COURT:  There are a lot of businesses

15   here in the United States where people from other

16   countries -- I know the Saudis have invested in the

17   petrochemical industry down here in Southeast Texas,

18   and I'm sure they come in to check on their investments

19   and they probably don't stand in line hoping to get

20   Group Number 1 and Group Number 2, do they?

21           MR. EVANS:  No, they don't, Your Honor.  As a

22   matter of fact, many, many large -- even large and

23   small corporations use aircraft.  I could cite to the

24   Court all sorts of statistics that talk about business

25   productivity.  And when you're talking about the soft

 1  dollars and the significant amount of time and expense
 2  involved with executive time, that even though there is
 3  a substantial expense associated with these aircraft,
 4  that it operates to the net benefit of these
 5  corporations.
 6          THE COURT:  Now, I'm not suggesting any of
 7  your clients would be involved in this, but I'm sure
 8  there are some people out there who use these planes,
 9  these jets to bring cocaine and heroin and meth up to
10  the United States.
11          MR. EVANS:  Unfortunately, that's true, Your
12  Honor.
13          THE COURT:  And they probably use it for money
14  laundering and other things; correct?
15          MR. EVANS:  Doubtlessly.
16          THE COURT:  But the FAA regulations that are
17  in play here, do they say, "Well, since somebody might
18  use a plane illegally, we're not going to allow
19  foreigners to open up these trusts and have planes that
20  they can fly to the United States," and what have you?
21          MR. EVANS:  No, Your Honor, there is certainly
22  no blanket denial in that regard.  We do have things
23  like what was referred generically as OFAC, and you
24  certainly want to make sure that anybody that you're
25  going to serve as a trustee for is not somebody that's

1   listed as a potential criminal actor on the OFAC list

2   and things of that nature, and that's just good

3   practice.

4          THE COURT:  If you had, though -- and I'm not

5   saying any of your clients.  But if there was probable

6   cause to believe a plane was used for drugs, for money

7   laundering, or for some other illegal or illicit act,

8   would you agree that that plane should be seized and

9   forfeited?

10         MR. EVANS:  As a substantial supporter of law

11  enforcement, I would like not to see any aircraft used

12  for an improper purpose, including drugs.

13         THE COURT:  I understand that.  But assuming

14  there is probable cause to believe that that's the

15  case, a Court using Chapter 59 of the Criminal Code --

16  Texas Criminal Code could properly have a plane seized

17  and have it forfeited; correct?

18         MR. EVANS:  Absolutely, Your Honor.

19         THE COURT:  Okay.  Go ahead.

20         MR. EVANS:  And we would just like again to

21  have the opportunity to allow the owner to explain.  As

22  Mr. Price stated in his affidavit, you know, they are

23  not dope jets and they are in an executive

24  configuration.  And the folks that we work for, the

25  folks associated with Ancheta, which is the equitable

```
 1   owner of our aircraft, that's held in trust on the FAA
 2   registry, just business people using the aircraft for
 3   their own business and personal purposes.  And they
 4   come up into the United States, they vacation in the
 5   United States, they make investments in the United
 6   States --
 7            THE COURT:  They shop at The Galleria, too.
 8            MR. EVANS:  I'm sure, certainly, Your Honor.
 9   And so it's doing -- and tracking Mr. Bishop's comments
10   about the exigent nature of the circumstances we have
11   here, Your Honor, these efforts, which really came
12   about over about the last year and a half, have created
13   a substantial dampening of the enthusiasm for citizens
14   of Mexico to own aircraft and operate them into the
15   United States.
16            We're not aware of any other state other
17   than Texas that is having to wrangle these cases.  And
18   we're up to 12 or 14 aircraft between Mr. Bishop and
19   our law firm and other law firms.  We're probably aware
20   of 12 or 14 cases all in Texas that have to do with
21   these types of aircraft, unfortunately, having to deal
22   with these types of circumstances.
23            THE COURT:  Where are most of those filed?
24   I'm just curious.
25            MR. EVANS:  Well, I described to the Court the
```

1  other one was seized at Houston Hobby.

2          THE COURT:  Right, I remember that one.

3          MR. EVANS:  And that case was filed in Harris

4  County.  And the other ones I don't believe have gotten

5  that far.  We're familiar with a bunch of aircraft that

6  are currently being detained.

7          THE COURT:  And again, if -- just so I'm

8  clear, if an aircraft, there is probable cause to

9  believe, is involved in illegal activity, was seized

10  in Harris County at Bush Airport, and within 30 days

11  they filed with the Harris County District Clerk a

12  Notice of Forfeiture and Seizure, then that would be

13  in compliance with Article 59 of the Texas Code of

14  Criminal Procedure; correct?

15          MR. EVANS:  Yes, Your Honor

16          THE COURT:  Okay.  Continue.

17          MR. EVANS:  And I'd just like to address very

18  quickly, Your Honor, this heavy burden of proof.

19  Because the State had every opportunity to come in with

20  an appropriate affidavit from Constable Price in order

21  to satisfy its heavy burden of proof.  And that's what

22  we're saying, in part, on 12(b)(6) to the Court, that

23  the State has failed to fulfill that burden of proof.

24          As we talked about earlier, the party

25  seeking the forfeiture has the initial burden of

1  establishing probable cause to believe the property is

2  subject to forfeiture.  That's the *United States vs.*

3  *$87,113 in United States Currency.*  I'll admit the

4  cites, Your Honor, it's in our pleadings already,

5  unless the Court would like me to.

6          To establish probable cause, the

7  Government must demonstrate a reasonable ground for the

8  belief of guilt supported by no less than prima facie

9  proof -- "less than prima  facie proof, but more than

10 mere suspicion."  And we believe, Your Honor, that

11 that's what we have set forth in the Price affidavit is

12 mere suspicion with using words like "possible" and

13 "belief" and "opinion," that those words do not rise

14 above the level of mere suspicion.  That's the same

15 case I cited to before and then citing other federal

16 cases as well.

17          The evidence, Your Honor, at the initial

18 filing of this case, must raise more than mere

19 suspicion.  In other words, the State must prove that

20 "it is more probable than not that the seized item was

21 either intended for use in or derived from a violation

22 of the enumerated offenses in the forfeiture statute."

23 And that's the -- I don't I could pronounce this --

24 *Vafaiyan, V-a-f-a-i-y-a-n, vs. State* case.  And that's

25 a Texas appellate case out of Fort Worth.

1            And we don't believe in this case, Your

2    Honor, that the State has made any showing of a nexus

3    between the money and the money laundering, organized

4    crime, or any other alleged criminal activity that

5    rises even slightly above the level of mere suspicion

6    in support of our 12(b)(6), Your Honor.

7            If the Court would permit me, also in our

8    pleadings, we have cited to *Arizona vs. United States.*

9    And in that case, Your Honor, it has a very good

10   discussion about the State not being able to insert

11   itself in a controversy in which a federal agency has

12   preempted that entire subject matter.  States are

13   precluded from regulating conduct in a field that

14   Congress has determined must be regulated by its

15   exclusive governance.  That is *Gade*, *G-a-d-e vs.*

16   *National Solid Waste Management Association,* 505 U.S.

17   88, at 115.

18            State laws are preempted when they

19   conflict with federal law, including when they stand

20   "as an obstacle to the accomplishment and execution of

21   the full purposes and objectives of Congress."  That's

22   *Hines vs. Davidowitz,* 312 U.S. 52, at 67.  But that

23   goes to the entire -- as we set forth in our pleadings,

24   Your Honor, the Federal Aviation Administration and

25   occupies the entire space of aircraft registration,

1  operation, maintenance, repair, including this

2  architecture.

3              We've attached to our pleadings the 2013

4  Federal Register where the FAA came out and announced

5  to the world that it continues with the non-citizen

6  trust arrangement.  And there are typically -- and

7  these documents are attached to our pleadings, as well,

8  Your Honor.  There are two documents that set forth the

9  relationship.  The Trust Agreement, which the equitable

10 owner of the aircraft, the trustor, conveys the

11 aircraft in trust to the Trustee, which is the United

12 States entity.  And that's a number of those -- any

13 number of those 7,680 aircraft that identified in our

14 supplement that belong to just five companies that

15 provided trust services.

16             And then typically, you're going to have

17 one of two documents that accompany the trust, Your

18 Honor.  One is an Operating Agreement, which allows

19 the original trustor, the equitable owner, to exercise

20 operational control over the aircraft.  And you can

21 also have a Lease Agreement.  There are just some

22 nuances associated with how the transaction is handled,

23 but those are the two primary means of doing it.

24             I'd like to just capture a couple of

25 final points, Your Honor.

1      We talked about the entire space being

2  occupied by the FAA.  In our supplement that we filed,

3  as I mentioned earlier, the aircraft, the Cessna

4  Citation, because of improper storage of the aircraft,

5  has suffered not less than $270,000 worth of damage.

6  We have repeatedly tried to encourage the State and

7  others, including the Bureau of Industry and Security,

8  in telling them that you can't just park one of these

9  aircraft like you would put an automobile in an impound

10  lot and just let it sit there for years.  If you do,

11  you're likely to lose all economic value of the

12  aircraft.

13      And so we have in the repair estimate

14  that's attached to our supplement, a maintenance

15  facility said, just for those two items, to remove

16  those two engines and return them to the manufacturer,

17  the engine manufacturer for recertification is

18  $135,000 per engine.  And so we're talking about

19  improper preservation and storage, leading to

20  substantial damages, which again goes to the exigency

21  of the situation that we have here, Your Honor.  We

22  don't believe there is probable cause.  There are no

23  other criminal proceedings that we're aware of.

24  Mr. Coleman may be aware of them.

25      And as I mentioned before, Judge, just in

1   closing, we believe that the Price affidavit is so

2   vague and so ambiguous that it could be lodged against

3   virtually any aircraft that's held in trust.  It is

4   devoid of specifics, it is devoid of facts, it is

5   devoid of probable cause, and the State has not

6   fulfilled its obligations to set forth that probable

7   cause in detaining the aircraft.

8              And I'll be happy to take any questions

9   from the Court, Your Honor.

10          THE COURT:  No, I appreciate that very much.

11  Thinking about the $135,000 per engine makes me feel a

12  little better about the cost of an oil change every

13  10,000 miles.

14          MR. EVANS:  Undoubtedly, Your Honor.

15          THE COURT:  Anyway, but thank you very much.

16              Mr. Coleman, would you care to respond?

17          MR. COLEMAN:  I'll be brief, Your Honor.  I'm

18  sure that the Court has read the state's reply to the

19  respondent's 12(b)(6) Motion to Dismiss, and we stand

20  on that reply, Your Honor.  And the only thing I would

21  like to do is if I may just start by pushing back

22  against a couple of things.

23          THE COURT:  Yes, please.

24          MR. COLEMAN:  One is this notion that the

25  State had anything to do with the Bureau of Industry

1  and Security and their administrative process of

2  detaining these planes and that whole administrative

3  process and it being some type of Fourth Amendment due

4  process violation.

5           My understanding -- first of all, there

6  was no collusion there.  And secondly, my understanding

7  is that as part of their administrative authority, they

8  can detain those planes without due process or any --

9  the typical process that would come along with a

10 criminal action.

11          THE COURT:  I think he kind of withdrew that

12 for purposes of this.  I mean, I appreciate the

13 informational background, but I don't know that -- I

14 think he kind of pulled back on that Fourth Amendment.

15          MR. COLEMAN:  Thank you, Your Honor.

16          Another thing I would like to push back

17 on is this argument by Mr. Evans that somehow these

18 seizure actions were motivated on the part of State by

19 some type of a profit motivation or some type of

20 motivation to forfeit and/or auction these planes.

21          THE COURT:  To get the auction fee?

22          MR. COLEMAN:  This whole business of auction

23 fee.  Again, I can't control what a third party puts in

24 their e-mail to someone else.  And if that's their

25 intent or if that's what they are inferring, you know,

1   again, I represent the State of Texas, Your Honor, and

2   I represent to the Court that this was not part of some

3   profit motivated endeavor on the part of the State,

4   Your Honor.

5                Just a couple of other things --

6                THE COURT:  Well, let me just say, I've known

7   you during my time on the bench, you've appeared in

8   front of me in other cases, and I think you're a very

9   honorable, very effective, very qualified attorney.  I

10  don't think you would allow yourself to be used in any

11  way just for purposes of trying to get a fee for the

12  State of Texas.  I do think that given your honor, the

13  type of honor that you bring to the profession, you

14  know, if you felt that -- you view this mechanism as a

15  way of seizing assets that would be, you believe, using

16  some criminal activity.  And I don't think you'd do

17  anything.

18               I think the question, though, is have

19  procedures been followed correctly, and I think that's

20  probably what the Court is going to decide.  But I

21  would agree with you, you would not participate in

22  anything that was sleazy or anything like that.  You're

23  not that kind of lawyer.

24               MR. COLEMAN:  Thank you, Your Honor.

25               And I'd also like to touch on the fact

 1  that it's been argued that the State's position is that

 2  any non-citizen trust is inappropriate.  That's not the

 3  argument, Your Honor.  The State's argument is that the

 4  non-citizen trust in this instance, under these

 5  circumstances, was used as a sham.  It was used to

 6  thwart the Chapter 49 of the United States Code,

 7  Chapter 50 of the United States Code; also Chapter 15

 8  of the Code of Federal Register, Section 740.15, which

 9  makes the distinction between a temporary sojourn of an

10  aircraft versus an actual export of an aircraft.

11            And I'll share with the Court a couple of

12  the factors under 15 CFR 740 that require or that are

13  criteria that must be met to either qualify as a

14  temporary sojourn or an actual export.

15            Chief among them is relinquishment of

16  operational control.  Under these circumstances, the

17  trust no longer had operational control.  It was a

18  non-citizen who had operational control.

19            Some of those factors that are criteria

20  that are included in that statute is whether or not the

21  trust or the non-citizen had the authority to hire a

22  cockpit crew; whether or not the non-citizen trust or

23  the -- whether or not the trust or the non-citizen had

24  the ability to dispatch the aircraft; whether or not

25  they could select the route; more importantly, were

 1  they able to determine where maintenance took place?
 2  Those are some of many of the criteria listed in 15 CFR
 3  740.  And some of those were listed in the Price
 4  affidavit.
 5              Another criteria was whether or not the
 6  space or the location of the aircraft was determined by
 7  the non-citizen.  Again, Mr. Price in his affidavit set
 8  forth maintenance logs and also maintenance records,
 9  logbooks, and made reference to FAA documentation that
10  would indicate that this aircraft spent a significant
11  amount of time in Mexico rather than in the United
12  States.
13              And under those circumstances and the
14  references that were made on the website that the
15  defendant used for this AGC company that set up this
16  sham trust that talked about circumventing the
17  registration requirements, under the totality of the
18  circumstances, Your Honor, I think that there was
19  sufficient notice and sufficient facts stated in our
20  Notice of Seizure that would be sufficient to put the
21  respondents on notice of our claim.
22              I'll remind the Court, we're not obligated
23  to lay out our entire case in that affidavit.  That's
24  what the discovery process is for.  But I think what
25  we are obligated to do is just lay out enough of the

 1  facts, enough of what our bases for our allegations are
 2  in order to put the respondents on fair notice of what
 3  the nature of the claims are.  And I believe we've done
 4  that, Your Honor.
 5              In fact, you know, Mr. Evans referred to
 6  our burden as, quote-unquote, a heavy burden of proof.
 7  It's a burden of proof that is probable cause.  It's
 8  the same burden that officers use day in and day out
 9  from DWI stops to drug cases, and they base their
10  probable cause on their opinion.  And that is
11  acceptable, as I understand it, under the law.
12              For Mr. Price to say in his affidavit
13  that based on his investigation and based on what he
14  discovered during his investigation and based on his
15  training and experience, he formed that opinion that
16  these certain law violations occurred, that is
17  sufficient to get us to probable cause in my
18  understanding of the law, Your Honor.
19              Also, I'll conclude with this:
20              There has been testimony -- well, not
21  testimony.  There's been references made to other a
22  number of other planes that will be seized.  I have no
23  control over what other planes are seized by other
24  District Attorneys throughout the state.  The focus
25  here, I believe, in the pleadings are on these two

1  planes, the Learjet and the Cessna, Your Honor.  I

2  don't know that that's appropriate -- an appropriate

3  consideration about what, if any, other planes may be

4  seized.

5            And another thing Mr. Evans talked about

6  was the amount of the damage to the plane by virtue of

7  it just sitting there.  Again, that's unsworn

8  testimony, it's conjecture on his part.  I have a live

9  witness here who can testify, based on his experience

10  with maintaining planes for a number of decades,

11  whether or not these planes are being properly

12  maintained, Your Honor.

13            We've stated our claim under Chapter 59 of

14  the Code of Criminal Procedure and we're not looking to

15  occupy any space that's set forth by any Federal

16  Register, federal lawsuit -- federal statute, excuse

17  me.  We're simply looking to enforce a Texas statute,

18  Chapter 59 of the Code of Criminal Procedure, that

19  we've alleged has been violated by the respondents.

20            Thank you, Your Honor.

21       THE COURT:  Thank you, Mr. Coleman.

22       *[Pause]*

23            Again, thank you.  Both sides did an

24  excellent job in the presentation of the issues on

25  those dispositive motions, and I am going to allow you

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

1  all to have seven days to provide the Court with some

2  supplemental briefing on the 59.04(b) issue.  I think

3  you indicated that that would be a sufficient amount of

4  time to do that.

5              Since you all have traveled a great

6  distance to be here, and so we don't waste your time

7  and your clients' resources to come again, and since I

8  will be taking the Motion to Dismiss under advisement

9  pending some supplemental briefing, I want to go ahead

10  and discuss the Motion to Access the aircraft to

11  perform maintenance and/or the Motion for Protective

12  Order and just briefly address that so I have some idea

13  of where everyone is coming from.  And again, this is

14  the defendant's motion.

15          MR. BISHOP:  Thank you, Your Honor.  Since we

16  brought this up at the last hearing, I got some

17  documents from Mr. Coleman's office that included --

18  I'll call them maintenance records loosely.

19          THE COURT:  And this is on the Learjet?

20          MR. BISHOP:  This is on the Learjet, Your

21  Honor.  Some boxes that were checked and some things

22  that were done.  My client still needs access to the

23  aircraft to have his pilots go look at it and see what

24  has or has not been done.  Again, as I've offered to

25  Mr. Coleman, if he wants to be there, whoever he wants

1  to -- we're not going to move the aircraft.  Simply to

2  go and look and see what has or hasn't been done and

3  what needs to be done to the aircraft.  I don't know

4  that they need more than a couple or three hours.  But

5  we would ask --

6         THE COURT:  Is this something that could be

7  worked out by an agreed order?

8         MR. BISHOP:  I've asked, Judge.  I don't know.

9         MR. COLEMAN:  Your Honor, I will concede that

10  under Chapter 34 of the Civil Rules of Procedure, that

11  the respondents are entitled to access if they petition

12  the Court for access to the plane.  I'll concede

13  access, Your Honor.  But there is no statutory

14  authority that I'm aware of that allows them to

15  manipulate this plane, in other words, to quote-unquote

16  maintain this plane, Your Honor.  Again, I've got

17  testimony here, if you'd like to hear it, about whether

18  or not it's being properly maintained.  But, Your

19  Honor, Rule 34 certainly covers inspection -- access

20  to and inspection.  But I'm not aware of any other

21  authority that allows them to come in while this plane

22  is in the custody of the state and perform any

23  maintenance or anything related to that plane.

24         THE COURT:  So the bottom line is that the

25  State is not amenable to working out an agreed order on

 1  the protocols that need to be used or would need to be

 2  used to ensure that the claim is being properly

 3  maintained.  I'm hearing from Mr. Bishop that it would

 4  probably take three or four hours with representatives

 5  from both sides present just simply to look at the

 6  plane -- I don't know -- crank up the engines or do

 7  whatever.

 8            Or do I need to have a full evidentiary

 9  hearing on plane maintenance?  That sounds like it's

10  going to take some time, and you have a witness here.

11        MR. COLEMAN:  It's the State's position that

12  these two planes are being properly maintained, Your

13  Honor.  And we've got testimony and evidence we're

14  willing to put on the record to that effect.

15        MR. BISHOP:  Judge, I'll say I find it

16  puzzling that they refuse to allow licensed pilots and

17  aircraft mechanics to perform maintenance on the

18  aircraft while they've got them seized.  I don't know

19  why, to be honest, they would object to that.  But

20  apparently they do.  But I would ask that the motion be

21  granted and that we be ordered to schedule some time

22  when all the parties can be there and go to the

23  aircraft.

24            And on a related note, I had also asked

25  Mr. Coleman last week and didn't get a response from

1  him whether or not the aircraft was going to be flown

2  any time soon.  And the reason that I'm asking is

3  because my client wants to know if he needs to get the

4  aircraft insurance that covers -- apparently, you can

5  have coverage for an aircraft that's going to be flown

6  or just ground coverage.  Obviously, there is a

7  difference in coverage and a difference in premium.

8  My client is not going to be flying the aircraft,

9  obviously, while it's in the custody of the State, but

10  I don't know whether Mr. Coleman intends to have

11  somebody fly it and I need to get an answer to that so

12  that I can make sure we've got the insurance.

13          THE COURT:  Mr. Coleman?

14          MR. COLEMAN:  Your Honor, I'll defer to my

15  technical expert on that issue.  Again, I'm more than

16  willing --

17          THE COURT:  Well, this is on the issue of

18  whether or not the State is going to fly the plane so

19  he can either pay a higher, probably exorbitantly

20  higher premium for the plane -- or pay the storage

21  premium, which is probably much less.

22          MR. COLEMAN:  Your Honor, in my understanding,

23  and this is completely as a lay person, you know, there

24  is maintenance that needs to be performed for storage

25  and there is maintenance to be performed for

 1  airworthiness, and the state's position is that we are

 2  doing the necessary maintenance to keep the plane in

 3  good working order for maintenance and for storage and

 4  not necessarily for airworthiness.  And that's all

 5  that's needed under these circumstances.  And again,

 6  I've got an expert who is willing to testify on that

 7  area, Judge.

 8          THE COURT:  Okay.  So that I'm clear -- and

 9  we've been going about two hours and I'm sure our court

10  reporter has been very gracious, our courtroom deputy,

11  my law clerk, others here, to sit here for doing the

12  arguments on the dispositive motions.  But what I'm

13  hearing is there isn't going to be an agreement on

14  protocol to follow.  The Court has some difficulty in

15  crafting, on its own, a motion -- I think we all agree

16  that on the Protective Order, we all agree that some

17  maintenance needs to be done.  Otherwise, the plane

18  will literally disintegrate out there.

19          And, you know, if that's going to be --

20  how much time do you need to put on some evidence from

21  your perspective?

22          MR. COLEMAN:  No more than 30 minutes, Your

23  Honor.

24          THE COURT:  And you would need to

25  cross-examine.  Are you prepared to do that?

1      MR. BISHOP:  Judge, I'm a little surprised

2  we're having an evidentiary hearing today on what was

3  on the pleadings, but I think the issues are whether or

4  not my client should have any access to the plane,

5  which he concedes.  And also --

6      THE COURT:  Well, I think what he may be

7  saying in reference to this witness is that, no, you

8  don't need to have access to it because the State of

9  Texas is taking care of it.

10     MR. COLEMAN:  No, actually, Your Honor, I

11  agree with Mr. Bishop on that particular point in that

12  I am willing under Rule 34 of the Civil Rules of

13  Procedure to give he and his client access to inspect

14  the plane, but what I am opposed to is any manipulation

15  under the guise of, quote-unquote, maintenance.  It's

16  the state's position that we are properly maintaining

17  the plane and we are willing to put on evidence of that.

18     THE COURT:  Manipulation, I don't understand.

19  What do you mean by manipulation?

20     MR. COLEMAN:  I don't know that the rules

21  allow for the respondent to go in and -- the only term

22  I can think of is "manipulate" it, because they are

23  actually doing something, performing an act on the

24  property, and that act being maintaining it.

25          We're happy to put on testimony about what

1    is being done and what needs to be done.  And at the

2    Court's direction, after hearing testimony, if the

3    Court thinks we need to do more, then we're open to

4    doing more.  But what I'm not conceding is that there

5    is legal authority to allow the respondents to go and

6    tamper with this plane while it's in our custody.

7          MR. BISHOP:  Your Honor, this may be an easier

8    solution.  What if my clients -- and I say my clients.

9    I believe it's going to be a pilot who flies the

10   aircraft, and maybe a mechanic or two along with him,

11   can go to the aircraft, inspect the aircraft.

12   Mr. Coleman can be there, whoever he want to be there.

13         THE COURT:  When you say "inspect" the

14   aircraft, what do you mean?

15         MR. BISHOP:  I'll say look under the hood for

16   not knowing any better terminology.

17         THE COURT:  Are you talking about flying it

18   around?

19         MR. BISHOP:  Not flying it.  No, it won't be

20   moved, it won't be flown.  It will simply be visually

21   looked at.  And I don't know enough about aircraft

22   mechanics, although I know Mr. Evans does, to tell you

23   exactly what they will do.  But it will be an onsite

24   inspection to go visit the aircraft, take a look at

25   what shape it is in, see what has or has not been done.

1          Then at that point folks that are more

2   qualified than I would be able to come up here and

3   testify, if we need, and rebut what I assume Mr. Purvis

4   would say, and would say, "No, Judge, the following

5   things need to be done and here's why."

6          But until we can get down there and

7   actually see the aircraft, I don't know how we're going

8   to know what does or doesn't need to take place.

9          So I think maybe rather than getting into

10  testimony today, if we could access, which I think

11  Mr. Coleman has no objection to, the aircraft and then

12  if I could simply get an answer on whether the aircraft

13  would be flown or not so that we can resolve the

14  insurance, we could reserve the right, if we need to,

15  to come back to the Court on maintenance issues.

16          THE COURT:  Okay, two things:

17          Mr. Coleman, do you have any problem in

18  letting the defendant, Learjet, know within seven days

19  whether or not the State of Texas is intends to fly

20  this airplane?

21          MR. COLEMAN:  May I have just a brief moment

22  to confer with my witness here?

23          THE COURT:  Yes, you may.

24          MR. COLEMAN:  Thank you.

25          *[Pause]*

1              Your Honor, I'm being told that there is

2    no intent to fly the aircraft.  However, to use an

3    industry term, there will be "ground runs" that will be

4    performed.

5              THE COURT:  What's a "ground run"?

6              MR. PURVIS:  Your Honor, a "ground run" is

7    basically you pull the aircraft out of the hangar, you

8    check the oil levels, you check, you know, all the

9    fluid levels, and you have a qualified pilot, which we

10   have on our staff, that would start the engines, warm

11   the engines up to normal operating temperatures.

12             THE COURT:  Would it fly?

13             MR. PURVIS:  No, sir.

14             THE COURT:  Mr. Coleman, is that a

15   representation in court you would not fly this plane?

16             MR. COLEMAN:  Yes, Your Honor.

17             THE COURT:  Would that satisfy your client's

18   need to know what type of insurance policy to purchase?

19             MR. BISHOP:  I don't know the particulars on a

20   ground run, but Mr. Coleman is representing to me and

21   the Court that they will not fly the plane.

22             And I take it that if that changes, you

23   will let me know with some notice beforehand?

24             MR. COLEMAN:  I'm happy to do that.

25             THE COURT:  Okay.

1          MR. BISHOP:  Then that will settle that, Judge.

2          THE COURT:  All right.  Now, the next thing

3    is this:  What the defendant has said is they want

4    three  or four hours to go out with their pilots and

5    mechanics, with the state's pilots and mechanics, to

6    look at the plane, not to fly the plane.  I will tell

7    you that seems very reasonable to me.  They've got a

8    million dollar investment there.

9          MR. COLEMAN:  I have no objection to an

10   inspection, Your Honor, access and inspection to the

11   aircraft.

12         THE COURT:  Okay.  Mr. Bishop, is that

13   sufficient?

14         MR. BISHOP:  It certainly is for now, Judge,

15   to be able to access and inspect the airplane.  If

16   there are maintenance issues that come up that we feel

17   need to be performed, we can raise them after the

18   inspection.

19         THE COURT:  Okay.  I would appreciate, either

20   by agreement, because this gets into a technical area --

21   I mean, I'm willing to issue that Protective Order and

22   grant that Motion to Inspect the plane.  But so that I

23   don't run afoul of some technical aviation term, I

24   would appreciate you all providing me quickly a

25   proposed order on that, because I will enter that.  I

1   think that it's most reasonable to allow the defendant

2   to at least make sure and verify that the plane is

3   being properly maintained.

4            And Mr. Purvis, I'm not suggesting that

5   your people don't know how to maintain a plane, but

6   they are the owners of the plane and they certainly

7   have a right to be assured that the plane is being

8   properly maintained and inspected.

9            So I'm going to grant that order.  But

10  just in case there is any technical language in that

11  order, I don't want to have to say, "Well, you didn't

12  go far enough, you didn't" -- whatever it is I need to

13  know.

14           Mr. Evans, you looked like you were about

15  to offer or weigh in on this.

16           MR. EVANS:  Thank you, Your Honor.  We'd just

17  like to have the -- we don't have a pending motion in

18  that regard right now, but I --

19           THE COURT:  But you would like an order like

20  that for Cessna?

21           MR. EVANS:  Yes, Your Honor.

22           THE COURT:  I'll grant that, but I want to

23  make sure it's the right order.

24           MR. EVANS:  Yeah.  And the key terminology,

25  Your Honor -- and I bet you I could probably get

1  Mr. Purvis to agree with this -- is that the

2  manufacturer sets forth the periodic maintenance and

3  storage terms for the aircraft.  It's in black and

4  white, it's in the maintenance manuals.  So that's an

5  objective standard with respect to how the aircraft --

6  in the case of the Citation, it's Chapter 10 of the

7  maintenance manual.  And it basically outlines you must

8  do this in order to properly maintain the aircraft,

9  which should be the guided document with respect to

10 both aircraft.

11         THE COURT:  Okay.  Well, and then whatever

12 that protocol is, I want it in the Protective Order.

13 And then if either defendant feels that the State is

14 not in compliance with that order, then I suspect I

15 would be hearing from you.

16         And, of course, I'm dealing with this now,

17 I'm not even dealing with the 12(b)(6) issues and the

18 other Motions to Dismiss issues.  But I want to make

19 sure I have something in place regardless of how that --

20 even during the pendency of the time where the Court

21 will be issuing its order on those Motions to Dismiss,

22 I want to make sure these planes are protected.

23         Am I clear?

24      MR. COLEMAN:  Crystal clear, Your Honor.

25      MR. BISHOP:  Yes, Your Honor, we'll draft a

1 proposed order and send it to Mr. Coleman as soon as we

2 can get it.

3         THE COURT:  All right, I'd like to have that

4 ready to be entered by the close of business tomorrow.

5         MR. BISHOP:  We can do that, Your Honor.

6         THE COURT:  Mr. Coleman, are you good with

7 that?

8         MR. COLEMAN:  No objection, Your Honor.

9         THE COURT:  All right.  Mr. Purvis, I know I

10 didn't put you under oath, but are you going to take

11 good care of that plane for the next 48 hours?

12         MR. PURVIS:  Yes, Your Honor.

13         THE COURT:  And there is no damage to that

14 plane that's going to happen in the next 48 hours,

15 either the Cessna or Learjet?

16         MR. EVANS:  As I mentioned before, Your Honor,

17 due to a combination of factors, unless there is

18 something that's been done to the Citation between

19 January and August that we're not aware of, I have no

20 documentation to that effect right now.  The mere fact

21 that if the aircraft was not subjected to the periodic

22 required maintenance by the engine manufacturer in the

23 six or seven month period, they are going to be

24 removed -- they must be removed and sent to the engine

25 manufacturer.  So I would not like to be seen in open

1  court as saying there is no damage to the aircraft,

2  because it's very likely that there is substantial

3  damage to the aircraft.

4         THE COURT:  But another 48 hours would not,

5  from your perspective, cause any more damage in all

6  probability?

7         MR. EVANS:  No, Your Honor.

8         THE COURT:  Okay.  I intend to get that

9  Protective Order entered by the close of business

10 tomorrow.  I'm giving you all time to make sure.  If

11 you are making reference to a maintenance manual of the

12 airplanes as setting the protocol, fine, but we need to

13 have that put in place.

14         All right.  Is there anything else that

15 needs to come before the Court at this time?

16         MR. COLEMAN:  Nothing further from the State

17 of Texas.

18         MR. BISHOP:  Nothing further, Your Honor.

19         MR. EVANS:  Nothing further, Your Honor, thank

20 you.

21         THE COURT:  All right, I appreciate it.  Both

22 sides did an excellent job, very professional, and I

23 thank you for your being prepared for today's hearing.

24 And with that, we stand adjourned.

25         *[12:14 p.m. - Proceedings adjourned]*

REPORTER'S CERTIFICATE


I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled

cause.


/s/ Ed Reed                              11-19-20
Edward L. Reed                           Date
Court Reporter